UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------
In re

      Lori Passarell

                                     Case No. 14 -10881 K

               Debtor.
-----------------------------------------------------------------
Lori Passarell,

               Debtor/Plaintiff,

         -vs-                           AP 17-1050 K

American Fruit and Vegetable Co., Inc.,

               Creditor/Defendant.
-----------------------------------------------------------------


David H. Ealy, Esq.
Trevett, Cristo, Salzer & Andolina P.C.
Attorneys for Plaintiff
2 State Street, Suite 1000
Rochester, NY 14614

Bruce Levinson, Esq.
Law Offices of Bruce Levinson
Attorneys for Defendant
805 Third Avenue, 12th Floor
New York, NY 10022


## DECISION AND ORDER GRANTING SUMMARY JUDGMENT TO THE DEBTOR

The Court rules that the Perishable Agricultural Commodities Act of 1930, as amended (7 U.S.C. §§499a-499s)(hereinafter "PACA") imposes liability on some individuals involved in farming corporations and partnerships but not on family members of a PACA dealer or merchant who is a sole proprietor with a d/b/a that sounds like something more sophisticated.

## Issue

Is the Debtor here a PACA Trustee?  If so, her debt to the Creditor (which claims PACA rights), is non-dischargeable under 11 U.S.C. §523(a)(4), and her assets (whatever they are) are trust assets under PACA.

The Court rules in favor of the Debtor.

## A Complicated Procedural History

This Adversary Proceeding was commenced on September 26, 2017 by the filing of a notice of removal by the Debtor/Plaintiff Lori Passarell (hereinafter "the Debtor") of a cross-claim asserted by Creditor/Defendant American Fruit and Vegetable Co., Inc. (hereinafter "the Creditor" or "AFV") in a state supreme court foreclosure action, commenced by a mortgagee, in which AFV intervened.[1]  The subject land was co-owned by the Debtor and her husband.  The Creditor (AFV) asserted claims against the Debtor, seeking to recover $35,297.50, and to impose a trust on the land.  AFV also asserted a trust on all her assets under PACA.  Once the issue arrived here by the Notice of Removal, a Rule 9027 Conference was held on November 7, 2017.  Numerous other pretrial conferences followed.

---

[1] Because the parties were co-defendants in a foreclosure proceeding filed by Genesee Regional Bank in which AFV filed cross-claims against the Debtor, there might be confusion about how to identify the parties with regard to "plaintiff" and "defendant".   The Debtor is styled here as "Plaintiff" only because she removed the issue to this Court, and AFV was not the plaintiff in the state court proceeding.

Long after the time expired for any motion to remand the matter to state court,[2] AFV

raised the question of whether this Court has jurisdiction of this matter.  This writer invited

the parties to submit letter briefs on this issue.  Subsequently, this writer determined that

bankruptcy court has jurisdiction of this matter for the reasons cited in the Debtor's letter

memorandum dated November 30, 2018 (Dkt. No. 23), which argued that: "Pursuant to 28

U.S.C. §157(b)(1), 'Bankruptcy judges may hear and determine all cases under title 11 and

all core proceedings arising under title 11'.  Pursuant to 28 U.S.C. §157(b)(2), core

proceedings include (K)'determinations of the validity, extent or priority of liens';

(B)'allowance or disallowance of claims against the estate...'; (O) 'other proceedings

affecting the liquidation of the assets of the estate...' ...AFV is seeking a money judgment

against the debtor...  AFV has asserted a lien against property of the estate, including the

Debtor's plan payments, which has delayed consideration of Debtor's attorneys' request

for allowance and payment of attorney's fees as an administrative expense.  Determination

of AFV's claim against the Debtor is therefore a core proceeding pursuant to

§§157(b)(2)(K), (B) and (O)."

The Debtor filed a Motion For Summary Judgment on May 1, 2019.  Exhibits

attached to that Motion include an affidavit of the Debtor, transcripts of depositions of the

Debtor and of an employee of the Creditor, and  an investigative report by the U.S.

Department of Agriculture as to a Complaint under PACA filed by AFV against the Debtor's

---

[2]On November 7, 2017, subsequent to a Rule 7016 telephonic conference with the attorneys for the parties, this Court signed an Order as follows: "Prior to December 7, 2017, Defendant shall file a letter with the Court as to whether it will consent to a determination of the matter by this Court or if it intends to move for remand or make a motion for further process."  This Order extended the time prescribed under Rule 9027(e)(3).  AFV did not file such a letter with the Court.

spouse, Dale Passarell.  That investigation resulted in a reparations award in favor of AFV against Dale for payment of the same claim and amount that AFV now seeks against Lori Passarell in this action.  Also included was a memorandum of law. (Dkt. No. 33).  Creditor AFV filed Opposition to this motion, including affidavits of a former officer of AFV, a current employee, and its attorney and also a memorandum of law. (Dkt. Nos. 39-42). The Debtor submitted a letter reply on July 1, 2019.  (Dkt No. 44).

## Background

The following is the factual situation that led to this Adversary Proceeding.  Dale Passarell (hereinafter "Dale") "doing business" as "Passarell Farms" was a wholesale produce vendor and broker licensed by PACA. (There was a trucking company owned by Dale that was a corporation but is not involved in this matter as to Lori.)  Lori Passarell, his wife, did business as Lori's Market Basket, also just a d/b/a.  It was a small retail fruit and vegetable stand.  Apparently, Dale Passarell as "Passarell Farms", purchased fruits and vegetables from AFV and had some seemingly minor amounts of produce shipped directly to Lori's roadside stand.  According to affidavits submitted with this motion, Lori Passarell is not licensed by PACA.  Her stand is a retail business selling no more than $100,000 per year.  There is no hint or suggestion that Dale's PACA transactions were principally for Lori's benefit.  Rather, it appears that he was generally active as a PACA broker.

Sometime after the commencement of the state court mortgage foreclosure action, Dale filed a Chapter 12 petition listing AFV as one of his creditors.  Lori  subsequently filed a Chapter 12 petition on April 14, 2014 because she was on the deed for the family

farmland, and she also listed AFV on her schedules. (She does not dispute a <u>contract</u> debt in the full $35,297.50 amount to AFV.)  Her Chapter 12 Plan was confirmed on February 10, 2015.   It provided for the treatment of AFV as follows: "The claim of AFV against Debtor shall be paid through and according to the terms of the Dale Passarell plan and shall be treated as secured as and to the extent provided in such plan.  The disputed claim of AFV shall not be treated as an unsecured claim in the Debtor's case but all rights and claims of AFV against Debtor shall be preserved and Debtor shall not receive a discharge from the AFV claim until such claim has been paid in full with interest as provided in the Dale Passarell plan."[3]  Dale was unsuccessful in his effort to perform his plan, and so his bankruptcy case under Chapter 12 was dismissed on February 19, 2016.[4]

The issue that results is whether the liability of Lori Passarell is that of a mere contract debt that is dischargeable in her case, or is non-dischargeable because she is liable under PACA, and whether her remaining assets are subject to a PACA trust.

## Discussion

The standard for deciding a summary judgment motion pursuant to F.R.Civ.P. 56 and Bankruptcy Rule 7056 is that there be a determination that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

---

[3]This language was agreed-to by the parties.  The Court does not view the language as an agreement that the debt is a non-dischargeable debt.  Rather it was an agreement to avoid litigating that question while there was hope that Dale could/would pay it.

[4]Bk. Case No. 13-11809 K

Given the language of the applicable provisions of PACA and the cases reported

thereunder, AFV argues a novel theory.  The statute says this:

> The term 'dealer' means any person engaged in the business of buying or
> selling in wholesale or jobbing quantities, as defined by the Secretary, any
> perishable agricultural commodity in interstate or foreign commerce, except
> that (A) no producer shall be considered as a 'dealer' in respect to sales of
> any such commodity of his own raising; (B) *no person buying any such*
> *commodity solely for sale at retail shall be considered as a 'dealer' until the*
> *invoice cost of his purchases of perishable agricultural commodities in any*
> *calendar year are in excess of $230,000*; and (C) no person buying any
> commodity other than potatoes for canning and/or processing within the
> State where grown shall be considered a 'dealer' whether or not the canned
> or processed product is to be shipped in interstate or foreign commerce,
> unless such product is frozen or packed in ice, or consists of cherries in
> brine, within the meaning of paragraph (4) of this section. Any person not
> considered as a 'dealer' under clauses (A), (B), and (C) may elect to secure
> a license under the provisions of section 499c of this title, and in such case
> and while the license is in effect such person shall be considered as a
> 'dealer'.[5] (Emphasis added.)

In an apparent attempt to recognize that PACA licenses may be issued to various

types of business entities and to define the manner to determine potential liability amongst

members, the statute contains a definition of the term "reasonably connected" to mean:

> [A]ffiliated or connected with a commission merchant, dealer, or broker as
> (A) *partner in a partnership*, or (B) *officer, director, or holder* of more than 10
> per centum of the *outstanding stock of a corporation or association*. A person
> shall not be deemed to be responsibly connected if the person demonstrates
> by a preponderance of the evidence that the person was not actively
> involved in the activities resulting in a violation of this chapter and that the
> person either was only *nominally a partner, officer, director, or shareholder*
> *of a violating licensee or entity* subject to license or was not an owner of a
> violating licensee or entity subject to license which was the alter ego of its
> owners.[6] (Emphasis added.)

---

[5] 7 U.S.C.A. § 499a(b)(6)

[6] 7 U.S.C.A. § 499a(b)(9)

Although the Debtor clearly is not a "dealer" under §499a(b)(6) (she sells only at retail and has not been shown to sell anywhere near $230,000), and although "Passarell Farms" is only a d/b/a for Dale Passarell (not a corporation in which she might have been a shareholder, officer or director)[7], it is argued that she was in a "position of control" of her husband's business and thus, all of her assets are the PACA trust assets because she helped him in the farm's labor and some ordering and accounts payable, and he helped her farm market by permitting her to order produce in the name of "Passarell Farms", which was a dba of Dale (and it is also inferred that she knew a family vacation was paid-for from Dale's farm account. [See p. 42 of Transcript of Lori Passarell dated May 2, 2018 annexed hereto and Dkt. No. 39 - Affidavit of Bruce Levinson in Opposition @ ¶ 4).  This ["position of control"] is not a term used in the statute.  It is used in the Second Circuit case of *Coosemans Specialties, Inc. v. Gargiulo, supra*.  It is clear, however, that the Coosemans Court employed the term only as a means to analyze the statute, not to add a whole new category of persons to the statutory definitions as to who is or is not subject to PACA. When an unpaid seller of produce seeks to hold an officer, director or shareholder of a corporate PACA trustee or a partner in a partnership that is a PACA merchant liable for produce sold to it, and such an individual denies personal liability and seeks to hide behind the business form, the arguments obviously turn to indicia of control.

---

[7]Not a single case cited by AFV imposes PACA trust liability on one who is not an officer, director, sole shareholder or other principal of a business entity that is a PACA business merchant, accentuating the finding that the individual fit within the statute's definition of "reasonably connected".  Id.   See, e.g. *Coosemans Specialties, Inc. v. Gargiulo, et al.*, 485 F.3d 701(2d Cir. 2007); *Red's Market v. Cape Canaveral Cruise Line, Inc.*, 181 F.Supp. 2d 1339 (M.D. Fla. 2002); *Golman-Hayden Co., Inc. v. Fresh Source Produce, Inc.*, 217 F.3d 348 (5th Cir. 2000); *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997); *Bronia, Inc. v. Ho.*, 873 F.Supp 854, 861 (S.D.N.Y. 1995); *Larry Shepard v. K.B. Fruit & Vegetable, Inc.*, 868 F.Supp. 703, 706 (E.D.Pa. 1994); *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F.Supp. 346 (S.D.N.Y. 1993); *Mid-Valley Produce Corp. v. 4-XXX Produce Corp.*, 819 F.Supp. 209 (E.D.N.Y. 1993).

The argument that that frame of analysis added "position of control" or "individual in control" (outside the factual context of a corporation or partnership) onto statutory liability under PACA is incorrect.  Being the wife (or child, or farm hand, or hired bookkeeper, etc.) of an individual who is a PACA merchant (again, "Passarell Farms" was merely a dba of Dale) is statutorily excluded from PACA liability no matter how much help such spouse or child or hired-hand or bookkeeper helped the family farm that was not a corporation or partnership.  And no matter the fact that there was a roadside stand, run by one of them, to contribute to the family effort.

Consequently, whatever degree of participation Lori testified-to is irrelevant as a matter of law.  But even if that were not so, the Creditor's argument that the totality of her deposition testimony admits "control" and so "admits" PACA liability, pushes the limits of zealous advocacy.  See Pages 32-43 of Transcript of Lori Passarell, attached hereto.

AFV clearly would wish for authority that would bind (or even persuade) this Court to agree with this proposition: "When a husband farmer in a farming family is a licensed PACA dealer who eventually failed to pay a PACA provider, his wife is a PACA fiduciary because she helped him on the farm and also owned a farm market that was provisioned to some extent by orders her husband placed or orders that she placed as his agent."

The Court finds that she was merely an "agent".  Liabilities of an agent in ordering for a principal are simply contract liabilities that are dischargeable in a bankruptcy case.

AFV also argues that the debt that Lori admits in the transcript gives rise to a PACA trust claim that encompasses all assets that make up her remaining assets, "exempt" or not.  That argument fails.  Again, Lori admitted a contract debt, not a PACA liability.

Consider the obtuseness of AFV's argument by means of a hypothetical.  Imagine the instance of a lemonade stand run by a daughter of Dale and Lori.  If the daughter ordered lemons for Passarell Farms so that she could sell lemonade at a county fair, are all assets that she might eventually own subject to a PACA trust because her dad didn't pay the supplier of the lemons?  She had fun at a family vacation paid for from her dad's farm account.  Would it make any difference if she was authorized to place produce orders for her dad, and authorized to sign checks for her dad?  Is the result <u>here</u> dependent on the fact that Lori and Dale were married, and Lori's produce stand was bigger than a lemonade stand? (It has been many decades since this State statutorily recognized that married women do have their own separateness for business and contractual purposes.[8])

<u>Conclusion</u>

The Court grants summary judgment to the Debtor Lori Passarell.  She was not subject to the fiduciary requirements that her husband was subject to as a PACA merchant.  Her debt to AFV is to be discharged upon the payment of the percentage of its claim that is to be made to unsecured creditors as provided for in her plan.  Her assets are not subject to any PACA trust claim by AFV.

SO ORDERED.

Dated:        Buffalo, New York
              August 23, 2019

                                        /s/ Michael J. Kaplan
                                        _____
                                               U.S.B.J.

---

[8]New York Married Women's Property Act 1860.

1    L. Passarell - Examination by Mr. Levinson

2         MR. EALY:  As with all other requests we'll

3    take them under advisement.

4    (Material request - Documents reflecting produce

5    purchase.)

6    BY MR. LEVINSON:

7         Q.   Do you recall ever doing business with

8    American Fruit and Vegetable?

9         A.   Yes.

10        Q.   When was that?

11        A.   I don't recall.

12        Q.   Did American Fruit and Vegetable provide you

13   with produce?

14        A.   Yes.

15        Q.   Did you pay for all that produce?

16        A.   No.

17        Q.   Why is that?

18        A.   There was an outstanding amount that needed

19   to be taken care of and we were working on getting it

20   paid and then it was stalled because there was a

21   dispute as to who owed the money.

22        Q.   When you say there was an outstanding amount,

23   due from who?

24        A.   From Lori's Market Basket for the invoices of

25   produce that I had received.

1          L. Passarell - Examination by Mr. Levinson

2     Q.    It's your testimony that there was a dispute

3 as to the amount of what was owed by Lori's Market

4 Basket?

5     A.    Not the amount.  As to who owed it.

6     Q.    Please give me specifics about that.

7     A.    The debt was mine.  I owed the money for the

8 invoices and American Fruit was saying that Dale

9 purchased the produce and he owed the money.

10    Q.    Do you have any correspondence or documents

11 reflecting that?

12    A.    Reflecting that?

13    Q.    This alleged dispute about who owed the

14 money.

15    A.    I spoke to Justin about it.

16        MR. EALY:  Clarify.

17        THE WITNESS:  Justin Metzger.

18 BY MR. LEVINSON:

19    Q.    When did you speak to Justin Metzger?

20    A.    I don't recall.

21    Q.    Did you speak to him in person or in some

22 other way?

23    A.    No.  He called me on the phone.

24    Q.    What was the substance of that conversation?

25    A.    He wanted to know why I had not made the

1     L. Passarell - Examination by Mr. Levinson

2   payments and I said that I was struggling and that I

3   was sending the money as I could get it and I was fully

4   intending to pay it as I could and he would get paid

5   back everything that I owed.

6       He said that PACA was going to handle it because of

7   Dale's license.  And I said Dale does not owe the

8   money.  I do.  And he said that was not true.

9       Q.   You acknowledged that the debt was yours?

10      A.   Yes.

11      Q.   Did you make any attempt to pay what you

12  thought was owed?

13      A.   I had been paying all along.  And, like I

14  said, I had the conversation with him that I fully

15  intend to pay everything and that I was going to pay

16  everything until he informed me that it was not my debt

17  and that it was Dale's and that he was going to get it

18  through PACA.

19      Q.   Is there any documentation to reflect that?

20      A.   I don't know.

21           MR. LEVINSON:  We ask for production of any

22  documents in the witnesses possession, custody or

23  control, related to that conversation.

24  (Material request - Documents related to debt

25  ownership.)

1          L. Passarell - Examination by Mr. Levinson

2     BY MR. LEVINSON:

3          Q.    Did you have any further communications with

4     American Fruit and Vegetable about that?

5          A.    No.

6          Q.    Just that one conversation?

7          A.    There was more than one, but that was the

8     final one.

9          Q.    When did that occur?

10         A.    I don't recall.

11         Q.    How many other conversations were there?

12         A.    Prior to that?  Three maybe.

13         Q.    Who were the parties to those conversations?

14         A.    Mike Wilson.

15         Q.    All the other conversations were with Mike

16    Wilson?

17         A.    Yes.

18         Q.    When did those occur?

19         A.    Prior to when I spoke with Justin Metzger.

20         Q.    Do you remember what year that was?

21         A.    I have no idea.  I do not.

22         Q.    In the first conversation with Mr. Wilson

23    what did you say to him and what did he say to you?

24         A.    He had just called saying that I was behind

25    on invoices and just wondering when I could pay them.

1       L. Passarell - Examination by Mr. Levinson

2    Q.    What did you say to him?

3    A.    Yes, I was going to pay them as soon as I

4  could get the funds available.  I was struggling for

5  cash at that time.  There was some kind of a struggle

6  going on.

7    Q.    What kind of struggle?

8    A.    Apparently -- I don't know.  There was

9  something.  Because I had talked to him about how

10  things were going to get paid just as soon as I could

11  do that. So I don't know.  I'm not sure.

12    Q.    What was the source of funds you were going

13  to use to pay American --

14    A.    Sales, whatever sales.

15    Q.    From Lori's Market Basket?

16    A.    Yes.

17    Q.    Subsequently you had another conversation

18  with Mr. Wilson?

19    A.    I had, I believe, three before Justin called

20  me.

21    Q.    What happened in the second conversation?

22    A.    Same thing.  Just wanted to know when I was

23  going to pay the bills that I owed.

24    Q.    Did you acknowledge the debt to him at that

25  time?

L. Passarell - Examination by Mr. Levinson

A.     Every time I talked to Mike Wilson I told him the same thing.  Fully intended to pay every dime that I owed.  I acknowledged that I owed and it was my bill and I wanted to get it straightened up and taken care of.

Q.     Do you recall any particulars about the third conversation with Mr. Wilson?

A.     No.  It was basically the same.

Q.     Have you paid all the bills that you acknowledged reflect your debt to American Fruit and Vegetable?

A.     No.

Q.     Why is that?

A.     Because American Fruit and Vegetable said that Dale owed the debt and they filed the claim with PACA.  And PACA concluded that Dale was responsible for it.

Q.     Did Lori's Market Basket ever do any business with Passarell Farms?

A.     Yes.

Q.     When was that?

A.     I don't know.

Q.     What kind of business did you conduct with them?

1       L. Passarell - Examination by Mr. Levinson

2       A.    I would buy cabbage from Dale for the stand.

3       Q.    Did Passarell Farms bill Lori's Market Basket

4   for that cabbage?

5       A.    I would imagine.

6       Q.    Do you have any specific recollection of that

7   transaction being reflected and billed?

8       A.    I don't.

9       Q.    Do you recall if Lori's Market Basket paid

10  money to Passarell Farms for cabbage?

11      A.    If I bought cabbage from Passarell Farms,

12  yes, there was money traded.  There was a check written

13  to Passarell Farms.

14      Q.    From what account?

15      A.    From Lori's Market Basket.

16      Q.    Do you recall who signed the checks?

17      A.    No.

18      Q.    On how many different occasions did you buy

19  cabbage from Passarell Farms?

20      A.    I have no idea.

21      Q.    Was it multiple times?

22      A.    It was more than once.

23      Q.    Do you have any documents that would reflect

24  those transactions?

25      A.    I don't know.

1    L. Passarell - Examination by Mr. Levinson

2    Q.   Do you know if Lori's Market Basket was

3  billed at a different price than what another reseller

4  of produce was being billed?

5    A.   I don't know.

6    Q.   Do you know if you got a preferential deal?

7    A.   I doubt it.  It was whatever the market price

8  was that week probably.  That's how they did business.

9    MR. LEVINSON:  We'd ask for production of any

10  documents related to business dealings between

11  Passarell Farms and Lori's Market Basket.

12  (Material request - Documentation of business

13  dealings.)

14  BY MR. LEVINSON:

15    Q.   Were you involved at all in the business of

16  Passarell Farms?

17    A.   How do you mean involved?

18    Q.   Did you perform any services for Passarell

19  Farms?

20    A.   I may have helped him, you know, out in the

21  field or do something.  I might have done something for

22  him, but I don't recall specifically what that is.

23    Q.   You have no specific recollection of any

24  services performed for Passarell Farms?

25    A.   Well, I did some stuff for him.  I don't know

1      L. Passarell - Examination by Mr. Levinson

2  specifically what.

3          MR. EALY:  Maybe you can make your questions

4  more specific.

5          THE WITNESS:  Yeah.  I mean I'm really not

6  sure.

7  BY MR. LEVINSON:

8      Q.    Were you involved at all in billing?

9      A.    Yeah.  I might have billed once or twice or

10  numerous times.  I mean I don't know specifically.

11     Q.    Were you involved in accounts receivable?

12     A.    Yeah, I may have called some people once or

13  twice.

14     Q.    Were you involved in accounts payable?

15     A.    Maybe.

16     Q.    Were you involved in handling banking

17  transactions for Passarell Farms?

18     A.    Might have been.

19     Q.    Did Passarell Farms have employees at that

20  time?

21     A.    Yes.

22     Q.    How many?

23     A.    Don't know.

24     Q.    Do you recall their names?

25     A.    For what time period?

1       L. Passarell - Examination by Mr. Levinson

2       Q.   2011.

3       A.   I would have to go back through the records

4  to find out.  No, I don't know specifically who was

5  working there at that time.

6       Q.   What records are you referring to?

7       A.   Probably payroll records.

8            MR. LEVINSON:  We ask for production of

9  payroll records of 2011.

10           THE WITNESS:  Well, I don't think I would

11  have access to those.  That would be Passarell Farms.

12  BY MR. LEVINSON:

13      Q.   You just said you would have to go back

14  through the records.

15      A.   I would have to look and see.  I mean I would

16  have to ask Dale.  I don't have access to that.

17           MR. EALY:  We're not going to produce

18  anything that Dale has.  Just the stuff that you have.

19           THE WITNESS:  I do not have that.  I do not

20  have access to that.

21  BY MR. LEVINSON:

22      Q.   Were you involved in payroll matters at all?

23      A.   May have been.

24      Q.   Were you involved in hiring and firing?

25      A.   Not really, no.

1    L. Passarell - Examination by Mr. Levinson

2    Q.    In 2010 and 2011 were any monies paid by

3    Lori's Market Basket for travel?

4    A.    I have no idea.

5    Q.    Do you recall if you traveled at all in

6    either of those two years?

7    A.    I don't know about those two years.  I have

8    no idea.

9    Q.    Do you recall taking vacations at that time?

10   A.    Yeah.  We went to Florida every year, but I

11   don't know when that ended.  I don't know if we were

12   going still then.

13   Q.    Where would you stay in Florida?

14   A.    Deerfield Beach.  Then we moved into Central

15   Florida, closer to a farm that we were involved with.

16   Q.    Did you rent --

17   A.    Yes.

18   Q.    How was that rental paid for?

19   A.    I have no idea.  Don't recall.

20   Q.    Do you recall what account the payments came

21   from?

22   A.    No.

23   Q.    Do you recall whether payments were made by

24   check or credit card?

25   A.    No.

1    L. Passarell - Examination by Mr. Levinson

2    Q.    Did you ever stay in hotels, motels, resorts

3    in Florida?

4    A.    No.

5    Q.    You would rent a house?

6    A.    Yeah.

7    Q.    Do you recall if any rent payments were made

8    from Lori's Market Basket account in either of those

9    two years?

10    A.    No.  I doubt it though.  Highly unlikely.

11    Q.    Do you recall if any education expenses were

12    paid from those accounts in those years?

13    A.    I don't know.

14    Q.    Do you recall if any transportation expenses

15    were paid for out of Lori's Market Basket account in

16    2010 and 2011?

17    A.    I don't know.

18    Q.    Did you have use of a car in 2010 and 2011?

19    A.    Yes.

20    Q.    Did you own that car?

21    A.    I would imagine, yeah.

22    Q.    The car was in your name, in your name alone?

23    A.    I would imagine.

24    Q.    Do you recall what kind of car it was?

25    A.    In 2011?